IN THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF ILLINOIS

| | |
|---|---|
| RJH Management Corp. d/b/a Golden Corral, and all others similarly situated, | ) ) ) |
| Plaintiffs, | ) Civil Action No. _____ |
| v. | ) ) ) ) |
| Certain Underwriters at Lloyds, London Subscribing to Policy Certificate No. TNR 19 8538, | ) ) ) ) |
| Defendants. | ) |

**COMPLAINT**

RJH Management Corp. ("Plaintiff"), complaining of Certain Underwriters at Lloyds, London Subscribing to Policy Certificate No. TNR 19 8538 ("Defendants"), for its Complaint, on behalf of itself and all others similarly situated, states as follows:

**Nature of the Case**

1.  This is a class action arising from Defendants' denial of insurance coverage for restaurant closures and the resulting loss of business due to the COVID-19 pandemic.

2.  Plaintiff is a franchisee of Golden Corral, a sit-down, family style buffet restaurant chain that is entirely reliant on in-person diners.

3.  Plaintiff's and its affiliates' restaurants have been financially devastated by the impact of the pandemic. Plaintiff and its affiliates were forced to close their restaurants and have been unable to maintain their business operations and have suffered extensive loss of business income as a result.

4.  Like many small business and restaurant owners, Plaintiff needed protection against unforeseen events that could affect its business operations and profits and invested in a

commercial insurance policy for itself and its affiliated Golden Corral franchise locations from Defendants, Policy Certificate No. TNR 19 8538 (the "Policy"), which included a Pandemic Event Endorsement ("Pandemic Endorsement"). A true and accurate copy of the Policy with the Pandemic Endorsement is attached hereto as Exhibit A and incorporated herein as if fully set forth.

5. Plaintiff paid premiums to Defendants for the Policy, and as COVID-19 forced states to close businesses, Plaintiff sought relief via the Policy and Pandemic Endorsement by submitting a claim to Defendants for Plaintiff's covered losses.

6. Instead of acknowledging that the Pandemic Endorsement covered Plaintiff's loss of business income due to the pandemic, Defendants "tentatively" denied Plaintiff's claim.

7. In denying Plaintiff's claim, Defendants wrongfully asserted that Plaintiff's losses were not due to a "Covered Disease" because, according to Defendants, SARS-CoV-2 (the virus causing the pandemic) is not a variant of the SARS virus.

8. Defendants then followed their "tentative" denial with a representation that they would "process" Plaintiff's claim "as if" it was covered under the Pandemic Endorsement, yet all the while continuing to reserve their rights to deny coverage before any actual payment on the claim is made.

9. Defendants have not withdrawn their "tentative" denial of Plaintiff's claim. Defendants have continued to reserve their rights to deny coverage. And Defendants engaged in delay tactics when they should be fully covering the claim.

10. Defendants have improperly failed to acknowledge coverage without reservation under the terms of the governing Pandemic Endorsement.

11. On behalf of itself and all other businesses and restaurants insured by Defendants whose claims have been similarly denied or delayed, Plaintiff brings this action against Defendants for breach of contract.

**The Parties**

12. Plaintiff is an Illinois corporation with its principal place of business at 1023 W. Dorian Avenue, Suite C, Springfield, Illinois, 62702. Plaintiff is a Golden Corral franchisee and operates its Golden Corral restaurant insured under the Policy and Pandemic Endorsement at 1000-1038 LeJune Drive, Springfield, Illinois 62703. As reflected by the Policy, including the Application materials and the Covered Locations endorsement, Plaintiff obtained this insurance not only for itself but also for affiliated entities operating Golden Corral franchises at: 3908 Broadway Street, Quincy, Illinois 62301; 8215 Broadway, Merrillville, Indiana 46410; 1445 S. Lamb Boulevard, Las Vegas, Nevada 89104; 1445 W. Sunset Road, Henderson, Nevada 89104; 915 Eagle Ridge Drive, Schererville, Indiana 46375; and 3421 Clark Ln, Columbia, Missouri 65202 (collectively the "Covered Locations").

13. Upon information and belief, Defendants Certain Underwriters at Lloyds, London, are an association of underwriters and/or individual insurance companies organized and existing under the laws of a foreign sovereign (the United Kingdom, except where noted) that sold or subscribed to the insurance policy at issue. The Underwriters at Lloyds who subscribed to the policy at issue, and more specifically to the Pandemic Endorsement, consist of the following Syndicates that subscribed in the percentage amount indicated for each Syndicate: Syndicate 2623, Beazley Furlonge, for 9.11111%; Syndicate 0623, Beazley Furlonge, for 2.0%; Syndicate 2987, Brit Global Specialty USA (Brit Syndicates)(based in the US), for 4.76190%; Syndicate 2988, Brit Limited for 3.17460%; Syndicate 1084, Chaucer Syndicates Limited for 7.93651%; Syndicate

1967, W.R. Berkley (based in the US) for 7.93651%; Syndicate 0727, MJ Meacock for 1.58730%; Syndicate 1183, Talbot Underwriting for 7.93651%; Syndicate 0435, Faraday Underwriting Limited for 3.96825%; Syndicate 4141, Active Underwriter SA Button (managed by HCC Underwriting Agency, Ltd.) for 7.93651%; Syndicate 2791, Managing Agency Partners, Ltd. for 3.17460%; Syndicate 2001 MS Amlin Underwriting/MS Amlin Group for 5.95238%; Syndicate 0510, Tokio Marine Kiln Syndicates Limited for 7.93651%; Syndicate 1729, Dale Underwriting Partners for 3.96825%; Syndicate 2488, Chubb Underwriting Agencies for 1.98413%; Syndicate 1686, AXIS Managing Agency, Ltd. for 12.69842%; and Syndicate 0609, Atrium Underwriters, Ltd. for 7.93651% (all of the forgoing collectively "Underwriters at Lloyds"). Upon information and belief, the Defendants are authorized to transact, and are transacting, business in the State of Illinois, Sangamon County, and throughout the United States, through their respective agents or Appointed Representatives, including but not limited to Professional Liability Insurance Services, Inc. ("PLIS").

## Jurisdiction and Venue

14.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 because there is diversity between at least one member of the Class and at least one of the Defendants and, on information and belief, there are more than 100 members of the Class and the aggregate amount in controversy is in excess of $5,000,000.00, exclusive of interest, attorney's fees, and costs.

15.     This Court has personal jurisdiction over Defendants because they conduct business activities within the territorial confines of this judicial district and division, including insuring Plaintiff's restaurant. The insurance policy in question also contains a "Service of Suit" clause in which the Defendants contractually agreed to submit to the jurisdiction of any court of competent

jurisdiction within the United States, and to accept service of process through the law firm of Lord, Bissel & Brook (now known as Locke Lord).

16. Venue is proper in this judicial district and division pursuant to 28 U.S.C § 1391 (a) and (b) because a substantial part of the events and omissions giving rise to this claim occurred in this district, including the sale and delivery of the insurance policy to the Plaintiff through the Defendants' agents/producer.

**Background Factual Allegations**

17. At all relevant times, Plaintiff and its affiliates have operated a number of Golden Corral restaurants at the Covered Locations in Illinois, Indiana, Nevada, and Missouri. Golden Corral restaurants feature sit-down, dine-in buffet dining, and offer the well-known Golden Corral "endless buffet menu." Like many businesses, Plaintiff obtained business interruption insurance to cover events that could disrupt or close its business.

18. For many years the Center for Disease Control ("CDC") and the World Health Organization ("WHO") have warned about the possibility of an airborne virus that could cause a worldwide pandemic and it is a well-known public risk.

19. Since at least 2006 the insurance industry has employed various "virus exclusions," to attempt to address the risks posed by viruses, including the known risk of virus pandemics and the previous SARS, MERS and Ebola outbreaks.

20. Underwriters at Lloyd's, through PLIS, sought to exploit this gap in the coverage market by offering a Pandemic Response or Pandemic Event Endorsement as a companion to its business interruption policies issued to restaurants.

21. As explained in promotional materials, this endorsement was designed to provide business interruption and extra expense coverage for a pandemic event when the insured's location

was closed, "whether individually or as part of an area wide multi-business shut-down." As touted, this "innovative coverage specifies *more than 20 different diseases* that are covered under this endorsement … afford[ing] strong defense against microscopic, but deadly threats" (emphasis in original). Underwriters at Lloyds, through PLIS, urged potential purchasers of this coverage to "Vaccinate Your Bottom Line."

22. Realizing that a future pandemic could be catastrophic for Plaintiffs dine-in restaurant business, Plaintiff added the Pandemic Endorsement to its business interruption policy for the policy period November 1, 2019 to November 1, 2020.

23. Under the Pandemic Endorsement, Underwriters at Lloyd's agreed to provide up to $1 million of coverage for "Pandemic Events." A "Pandemic Event" is defined as "the announcement by a Public Health Authority that a specific Covered Location is being closed as a result of an Epidemic declared by the CDC or WHO." An epidemic under the endorsement involves an occurrence of a "Covered Disease" listed in the endorsement including "its mutations or variations." Severe Acute Respiratory Syndrome-associated Coronavirus ("SARS-CoV) disease" is a listed Covered Disease.

### The SARS-CoV-2 Pandemic

24. Infection with Severe Acute Respiratory Syndrome ("SARS") coronavirus (SARS-CoV) can cause a severe viral respiratory illness.

25. SARS – which research suggests originated in bats - was first reported in Asia in February, 2003. The illness spread to more than two dozen countries in North America, South America, Europe, and Asia before the SARS global outbreak was contained.

26. In 2019, a coronavirus was discovered in Wuhan, China.

27. Like SARS-CoV, this virus is a betacoronavirus with its origins in bats.

6

28. According to the CDC, the source of the current virus is a seafood and live animal market in Wuhan, suggesting the virus jumped from bats, through an intermediary animal, to humans.

29. The Coronavirus Study Group ("CSG") of the International Committee on Taxonomy of Viruses ("ICTV"), which is responsible for developing the official classification of viruses assessed the virus strain discovered in Wuhan, China and designated it as Severe Acute Respiratory Syndrome coronavirus 2 (SARS-CoV-2).

30. As the WHO stated, ICTV chose SARS-CoV-2 as the name "because the virus is genetically related to the coronavirus responsible for the SARS outbreak of 2003."

31. Johns Hopkins Center for Health Security recently described the virus in their SARS-CoV-2 Genetics Bulletin, updated April 16, 2020 as follows:

> [T]he Coronavirus Study Group (CSG) . . . officially named the novel coronavirus SARS-CoV-2. The CSG analyzed viral genomes from several patients and assessed phylogenetic (evolutionary) relationships between the new virus and known coronaviruses. **The committee found that the genome of viruses isolated from patients was similar enough to SARS genomes to be considered a variant of SARS, not an entirely novel virus.** While the clinical presentation, epidemiologic patterns, and host range of SARS-CoV-2 may differ from the original SARS-CoV, it is the *genetic* similarity between the 2 viruses that is used to conclude they are the same species. For this reason, **the CSG has named SARS-CoV and SARS-CoV-2 as variants of the species known as *Severe acute respiratory syndrome– related coronaviruses*.** The name SARS-CoV-2 is distinct from the name of the disease, which the WHO has officially designated COVID-19. (emphasis added)

32. SARS-CoV-2 is the virus that causes the COVID-19 disease implicated in the ongoing 2019–2020 coronavirus pandemic.

33. On March 11, 2020, the WHO declared the 2019-20 SARS-CoV-2 outbreak a pandemic (a widespread epidemic).

## The Closure Orders

34. Thereafter, due to the presence of COVID-19 in the communities where the Plaintiff, the Covered Locations and Class members operate their businesses, state authorities mandated "stay at home" orders, "physical distancing" orders, closure and other orders limiting the number of people that can gather in any setting.

35. These orders have had a financially devastating impact on the restaurant and hospitality industry, including the Plaintiff, the Covered Locations and the Class members.

36. For example, on March 16, 2020, in direct response to the COVID-19 outbreak, and pursuant to the Illinois Emergency Management Agency Act, 20 ILCS 3305/1, *et seq.*, Illinois Governor J.B. Pritzker issued Executive Order 2020-07, ordering people to "stay at home" and ordering: "all businesses in the State of Illinois that offer food or beverages for on-premises consumption—including restaurants, bars, grocery stores, and food halls—[to] suspend service for and … not permit on-premises consumption." Executive Order 2020-07 (2020). On March 16, 2020, Governor Holcomb of Indiana issued a similar order entitled Executive Order 20-08. On March 17, 2020 Governor Steve Sisolak of Nevada issued a similar order called a Risk Mitigation Initiative, closing in-person dining, and ultimately entered a Stay at Home Order on April 1, 2020. Governor Parson of Missouri also issued a similar stay at home order (these orders and all extensions thereof are collectively the "Closure Orders.")

37. Illinois Executive Order 2020-07 and the Closure Orders were issued in direct response to the conditions caused by COVID-19, mandated that the public "stay at home" and prohibited the public from accessing the Covered Locations and the Class members' dine-in facilities. Although the Covered Locations were closed, they tried to operate "to go" services at certain of the Covered Locations.

38. Because Plaintiff's business model is a dine-in restaurant, operating "to go" was cost-prohibitive.

39. As a result of the Closure Orders, Plaintiff, the Covered Locations and the Class members have been forced to close, resulting in substantial lost revenues and forcing the Plaintiff, the Covered Locations and Class members to furlough or lay off the majority of their employees.

40. Due to the Closure Orders, Plaintiff and the Covered Locations suffered significant loss of business income, as patrons have been prohibited to dine in at restaurants.

41. By late March 2020, Plaintiff and the Covered Locations were forced to suspend business operations and close.

42. Plaintiff subsequently made an insurance claim to Defendants, which Defendants denied in a letter dated May 1, 2020.

### The Claim Under the Pandemic Endorsement, and Defendants Denial of the Claim

43. The Pandemic Endorsement amends the Policy to provide coverage to Plaintiff and the Covered Locations in the circumstances here.

44. The insuring clause in the Policy indicates it will "indemnify the Insureds for [Actual Net Loss and Incident Response Expenses] provided that such result directly from an Incident that occurs [within the policy period]."

45. The Pandemic Endorsement defines an Incident as a Pandemic Event including (but not limited to) circumstances where the CDC or WHO declared an epidemic, with an epidemic (or here, pandemic) involving an occurrence of a Covered Disease.

46. The Pandemic Endorsement defines a Covered Disease as any number of "pathogens, their mutations, or variations" including Severe Acute Respiratory Syndrome associated Coronavirus (SARS-CoV) disease.

47. Defendants denied Plaintiff's claim on the purported grounds that SARS-CoV-2 is not the same pathogen as SARS, or a mutation or variation of it.

48. Defendants are wrong, as SARS-CoV-2 is a variation of SARS.

49. Under the Policy, Defendants promised to cover precisely the type of business losses and expenses Plaintiff and the Covered Locations have suffered and Defendants are obligated to pay for them.

50. In a breach of its contractual obligations, Defendants denied Plaintiff's claim and have failed to pay for the losses and expenses at the Covered Locations.

51. Defendants subsequent letter stating that they would "process" Plaintiff's claim "as if" it was covered under the Pandemic Endorsement, while at the same time reserving rights to deny coverage, changes nothing and gives no comfort to Plaintiff that it will be properly and promptly paid for its covered losses. Defendants did not withdraw their denial of coverage, and have continued to reserve their rights to deny coverage.

52. Upon information belief, Defendants have failed to pay for similar business losses and expenses suffered by hundreds of other insureds holding policies that are, in all material respects, identical to Plaintiff's Policy and specifically the Pandemic Endorsement.

53. Plaintiff and similarly situated class members are entitled to coverage now under the Underwriters at Lloyds Pandemic Endorsement during this pandemic.

## CLASS ACTION ALLEGATIONS

54. Pursuant to Fed. R. Civ. P. 23(a) and (b)(2) and/or (b) (3), Plaintiff, on behalf of itself and others similarly situated, seeks certification of the following class:

> All persons and entities in the United States who made insurance claims with Defendants for loss of business income and/or expenses under the Underwriters at Lloyd's Pandemic Event Endorsement for which Defendants have denied coverage. or

have otherwise failed to acknowledge coverage, on the grounds that SARS-CoV-2 is not a mutation or variation of SARS (the "Class").

55. Excluded from the Class are Defendants, as well as their officers, employees, agents or affiliates, and any judge who presides over this action, as well as all past and present employees, officers and directors of Defendants. Plaintiff reserves the right to amend or modify the Class definition with greater specificity or division into subclasses after it has had an opportunity to conduct discovery.

56. This action satisfies each of the requirements of Fed. R. Civ. P. 23 and is well suited for class adjudication.

57. Numerosity. Fed. R. Civ. P. 23(a)(1). The Class is so numerous that joinder of all members is unfeasible and not practicable. While the precise number of Class members has not yet been determined, it is readily identifiable from information and records in Defendants' possession. Plaintiff is informed and believes that hundreds of businesses are insured by Defendants with policies substantively identical to Plaintiff's Policy containing the Pandemic Endorsement and were denied coverage on the same grounds as Plaintiff.

58. Commonality. Fed. R. Civ. P. 23(a)(2). There are several questions of law and fact common to the Class. These common questions of law and fact include, without limitation, whether SARS-Co-V-2 is a variant of SARS and whether Defendants breached their insurance policy agreements with Plaintiff and the Class by denying valid claims for coverage made under the terms of those agreements, by falsely claiming SARS-Co-V-2 is not such a variant.

59. Typicality. Fed. R. Civ. P. 23(a)(3). Plaintiff's claims are typical of the claims of other Class members. Plaintiff and all Class members were harmed by the same unlawful conduct, that is, Defendants' wrongful denial of valid claims for coverage on the grounds is SARS-Co-V-2 is not a variant of SARS.

60. <u>Adequacy of Representation.</u> Fed. R. Civ. P. 23(a)(4). Plaintiff will fairly and adequately represent and protect the interests of the other members of the Class. The interests of the Plaintiff are coincident with, and not antagonistic to, those of the Class, and Plaintiff's Counsel are competent and experienced in litigating class actions.

61. <u>Predominance.</u> Fed. R. Civ. P. 23(b)(3). Questions of law and fact common to the members of the Class predominate over questions that may affect only individual class members. In uniformly denying claims by falsely claiming that SARS-Co-V-2 is not a variant of SARS, Defendants have acted on grounds generally applicable to the entire Class, thereby making damages with respect to the Class as a whole appropriate.

62. <u>Superiority of Class Action</u>. Fed. R. Civ. P. 23(b)(3). A class action is superior to other available methods for the fair and efficient adjudication of this controversy since joinder of all the members of the Class is impracticable. Furthermore, the adjudication of this controversy through a class action will avoid the possibility of inconsistent and potentially conflicting adjudication of the asserted claims, and there will be no difficulty in the management of this litigation as a class action.

**Claim For Breach of Contract**
**(On Behalf of Plaintiff and the Class)**

63. Plaintiff hereby re-alleges every factual allegation contained above.

64. Defendants have entered into contracts with Plaintiff and the Class under which Defendants agreed to provide insurance coverage to Plaintiff and the Class pursuant to the terms of their commercial policy agreements including the Pandemic Endorsement.

65. Plaintiff and the Class performed all their obligations under these contracts.

66. Defendants breached its contracts with Plaintiff and the Class by improperly denying coverage or failing to acknowledge coverage.

67. Plaintiff and the Class have sustained damages as a result of Defendants' breaches of contract in an amount to be proven at trial.

### Request for Relief

WHEREFORE, Plaintiff, individually and on behalf of the other members of the Class proposed in the Complaint, respectfully request that the Court enter judgment in its favor and against Defendants, as follows:

A. Declaring that this action is a proper class action, certifying the Class as requested herein, designating Plaintiff as Class Representative and appointing the undersigned counsel as Class Counsel;

B. Ordering Defendants to pay actual damages to Plaintiff and the other members of the Class;

C. Ordering Defendants to pay attorneys' fees and litigation costs to Plaintiff and the other members of the Class;

D. Ordering Defendants to pay both pre- and post-judgment interest on any amounts awarded; and,

E. Ordering such other and further relief as may be just and proper.

### Jury Demand

Plaintiff demands a trial by jury of all claims in this Complaint so triable.

Respectfully submitted,

RJH Management Corp. d/b/a Golden Corral, and all others similarly situated,

Dated: June 11, 2020

s/John P. Bjork
Joseph M. Vanek (ARDC # 6197046)
Greg Shinall (ARDC # 6204392)
Gregg R. Hague (ARDC # 6188006)

John P. Bjork (ARDC #6299111)
SPERLING & SLATER, P.C.
55 West Monroe Street
Suite 3200
Chicago, Illinois  60603
(312) 641-3200


David E. Woodward (ARDC #6321806)
R. Brian Woodward
Woodward Law Offices, LLP
200 East 90th Drive
Merrillville, IN 46410